IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTTY THOMPSON | Case No. 1:09-cv-00963-JLT |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| vs. | ORDER DIRECTING THE ENTRY OF JUDGMENT FOR DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF SCOTTY THOMPSON |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

**BACKGROUND**

Plaintiff Scotty Thompson ("Plaintiff") seeks judicial review of an administrative decision denying his claim for disability insurance benefits under Title II of the Social Security Act (the "Act").

**FACTS AND PRIOR PROCEEDINGS**[1]

On November 10, 2004, Plaintiff filed an application for disability insurance benefits under Title II of the Act, alleging disability due to physical problems. AR at 99-101. After initial denial of his request for benefits by the Agency, Plaintiff requested a hearing before an administrative law judge ("ALJ"); the ALJ issued a decision denying benefits on August 20, 2008. Id. at 10-21.

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1  Specifically, the ALJ found that Plaintiff was not disabled within the meaning of the Act at any time
2  from the alleged onset date through December 31, 2007, the date-last-insured. Id. at 21. The
3  Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 20, 2009. Id.
4  at 5-7. Therefore, the ALJ's decision became the decision of the Commissioner.

<u>Hearing Testimony</u>

At the hearing before the ALJ on July 23, 2008, Plaintiff testified that his current age was 39, and that he was born on November 4, 1968. AR at 458. Plaintiff stated that he was five-foot, ten or eleven inches tall, weighing about 283 pounds. Id. When asked if this was his normal weight, Plaintiff responded that at the time of his injury he weighed 205 and then "shot all the way up to [his] highest weight of 314." Id.

According to Plaintiff, the highest grade of school he completed was high school, and he can read and write. Id. Plaintiff stated that he is right-hand dominant, has a driver's license, and is able to drive a car. Id.

Plaintiff testified after his service with the Air Force, he went to work as a firefighter in Georgia and then returned to Bakersfield, where he was employed by Hall Ambulance. AR at 459. He also worked at Kmart and Mercy Hospital, trying to get a better job. Id. Plaintiff confirmed that firefighting was his "MOS" (military occupation specialty) in the Air Force. Id.

Plaintiff stated that he no longer works because of his back, side, weight, headaches, and the amount medication required to alleviate the pain. AR at 459. He testified that he is in pain "constantly," with the worst pain in his back. Id. at 466. This pain "goes from dull to sharp" depending on his activities; on a scale of one to ten, Plaintiff estimated his pain to be about a four while medicated and a six or seven without medication. Id.

Plaintiff discussed donating a kidney "three/ four years ago" and the damage sustained to his side during the procedure. AR at 460. Plaintiff stated, "During the surgery the doctor accidently clipped a nerve on my flank, which caused muscle paralysis. I still have feeling in it, but now I have a big hernia on the side that I have no control of the muscles." Id. Plaintiff stated two attempts were made to repair the hernia, and that neither was successful. Id. He added that this causes numbness on the side of his torso. In addition, Plaintiff said sitting up sometimes causes a "ripping or tearing"

sensation in his stomach area.  Id. at 461.  Plaintiff said this hernia was seen by the Social Security doctor in February of 2005.  Id.

     Other physical issues discussed at the hearing by the Plaintiff included migraine headaches and an esophageal ulcer.  Plaintiff testified that he has had migraine headaches since at least 1992.  AR at 461.  To treat them, Plaintiff stated that he took Ibuprofen if he caught the migraine early enough, but if not then he would "try Zomig or Imitrex or something."  Id.  Due to his esophageal ulcer, which had been bleeding recently, Plaintiff confirmed that he was taking 20 to 40 Tylenol a day.  Id. at 462.  This resulted in liver damage and a "fatty liver" according to Plaintiff.  Id.

     With regard to his back problem, Plaintiff testified the injury occurred in May of 2002.  AR at 462.  Plaintiff and the individuals with whom he worked made an emergency response, and when they lifted the patient from the ambulance gurney to the hospital bed, Plaintiff "felt a pull in [his] low back region."  Id.  Plaintiff stated the pain he felt was not severe enough to require him to stop working his shift immediately, but the next day he was unable to sit up or move after waking.  Id.  Plaintiff confirmed he made a Worker's Compensation Claim for the injury and that he has been on temporary total disability since 2002.  Id. at 463.  Plaintiff explained that he was "permanent stationery [sic] for a short time" until he knew available treatment options.  Id.

     Plaintiff testified that he had epidural injections and "L5-S1 global fusion" surgery.  AR at 463.  Though Plaintiff desired to have a disc replacement, he stated he did not because the state would not pay for the procedure.  Id.  As a result of the surgery, the disc successfully fused, but the Plaintiff described feeling "worse now than before the fusion itself."  Id.  For the pain, Plaintiff took Soma and "swap[ped] off between the Vicoprofen and the Darvocet and Neurontin."  Id. at 464.  Plaintiff used a bone stimulator that he said helped, though it took about four or five months to do so.  Id.  Plaintiff stated he no longer received epidural injections.  Id. at 465.

     After firing Dr. Christiansen, Plaintiff testified that he began seeing Dr. Larsen as his primary care physician, who treated Plaintiff for "probably four" years and performed the surgery on his back.  AR at 464-65.  Plaintiff also testified that he was seen by Dr. Straight, the workers' compensation agreed medical examiner, and went to the VA for medical treatments.  Id. at 465.  He went to the VA for his headaches, sinuses, liver, and esophageal ulcer.  Id.  He reported that the VA

1  was "basically [his] primary doctor, other than for the back." Id. Per Plaintiff, Dr. Murphy, the
2  agreed medical examiner for his psychological problems stated, "I needed to be seen by a
3  psychologist and therapist." Id. Plaintiff testified he "definitely" still suffered from panic attacks
4  and agoraphobia. Id.

5       Plaintiff reported the medications caused him drowsiness, memory loss, and lethargy. AR at
6  466. Further, although he engaged in physical therapy, it did not help. Id. At the time of the
7  hearing, Plaintiff used a cane, which he stated was prescribed by Dr. Larsen. Id. at 467. Plaintiff
8  said he had been using this cane "on and off for the past couple years," though the doctor told him
9  not to use the cane so frequently. Id. He continued to use the cane, however, and explained that
10 recently he started having problems with a burning sensation in his right thigh that "causes my leg to
11 go out from under me." Id.

12      Plaintiff testified that he lies down during the day, and estimated he could walk "maybe a
13 half-a-block" before he felt the need to stop. AR at 467. He estimated he could stand for "15
14 minutes or so" before he felt the need to sit, and sit for "30/40" minutes if comfortable. Id. at 468.
15 Plaintiff stated he cannot kneel, stoop, or squat to the ground without pain. Id. A normal day for
16 Plaintiff included doing minor house work. Id. He could do his own cooking. Id. at 469. For
17 exercise he would do "some minor walking." Id. Plaintiff stated that he had no social life and
18 believed that his condition caused the end to a nine-year relationship. Id. at 468-69.

19      With all his problems, Plaintiff stated, "I'm screwed up" and "[i]f I didn't have to leave the
20 house I wouldn't." Id. at 470. Feeling worthless "all the time," Plaintiff stated he had suicidal
21 thoughts, but never attempted it. Id. He testified he had crying spells frequently, from a couple
22 times a day to a couple times a week, and felt like he was "slipping off the edge." Id.

23      A vocational expert ("VE"), Kenneth Ferra, testified also. He described Plaintiff's past work
24 as a firefighter and paramedic as very heavy and skilled. AR at 472. The ALJ then posed three
25 hypothetical situations to the VE.

26      In the first hypothetical, the ALJ described a person of Plaintiff's age, education and
27 experience, who was physically capable of light work, but who could never climb ladders, ropes, or
28 scaffolds. AR at 472. This individual could occasionally balance, stoop, kneel, crouch, crawl, and

climb ramps or stairs, but could not walk on uneven terrain. Id. Also, he could remember and carry out simple, repetitive tasks. Id. The VE testified that this individual would not be capable of performing Plaintiff's past relevant work, but that he could perform other jobs in the regional or national economy. Id. at 473. In giving examples, the VE stated the individual could work as a cleaner, sorter, or ironer. Id.

Next, the ALJ hypothesized a worker of Plaintiff's background with increased limitations, who could lift and carry less than five pounds, stand and walk no more than an hour, and sit no more than an hour total in an eight-hour work day. AR at 473. The VE confirmed such an individual would be unable to perform Plaintiff's past relevant work or any other work. Id.

The third individual the ALJ proposed was a worker with increased limitations who, independently of any physical limitations, could not complete an eight-hour work day without interruption from psychologically-based symptoms. AR at 473. The VE concluded this person would also be unable to perform either Plaintiff's past relevant work or any other work. Id.

Relevant Medical Evidence

Following his injury, Plaintiff went to his private physician, Dr. David Field, for treatment. See AR at 177; 230. Field conducted an x-ray of Plaintiff's back and diagnosed him with a thoracolumbar strain on May 23, 2002. Id. at 230. Shortly thereafter, Plaintiff's employer referred him to Dr. Willard Christiansen for evaluation, who became Plaintiff's primary treating physician. Id. at 177. Like Dr. Field, Dr. Christiansen diagnosed Plaintiff with a thoracolumbar strain, which he treated "conservatively." Id. Plaintiff reported to Dr. Christiansen that he had a stiff back, but no pain, and had discontinued his medication. Id. at 231.

On June 11, 2002, Plaintiff began to complain of increased low back pain to Christiansen. AR at 231. As such, Plaintiff underwent an MRI, which revealed an "L5-S1 central broad based 4.5 mm posterior disc protrusion with mild effacement of the thecal sac but no evidence for spinal or foraminal stenosis." Id. Plaintiff went to Dr. Stephen Helvie for a consultation and nerve conduction study, the results of which were within normal limits. Id. Dr. Helvie opined that Plaintiff had suffered a lumbosacral strain, and recommended continuation of therapy. Id.

Upon recommendation of his attorney, Plaintiff sought the care of Dr. John Larsen. AR at

115. Dr. Larsen began care on April 29, 2003. Id. at 229. Dr. Larsen diagnosed Plaintiff with a L5-S1 disc injury, for which he prescribed physical therapy, medication, and a lumbar corset. Id. at 235-36. Dr. Larsen noted that he believed that Plaintiff was temporarily totally disabled because Plaintiff could not perform his normal and customary duties. Id. On August 25, 2003, Dr. Larsen observed that Plaintiff's condition had deteriorated since being seen by Dr. Christiansen, and listed the following objective factors of disability: broad-based disc protrusion with multilevel disc injury on MRI scanning, guarding, and restriction in range of motion. Id. at 218-19.

Dr. Emanuel Dozier, in his capacity as an orthopedic agreed medical examiner, saw Plaintiff on February 16, 2005. AR at 255. Plaintiff told Dr. Dozier that he had "a 4/10 level intensity of pain with a dull ache that is present continuously" and that the pain "will frequently increase to a 7/10 if he is in a painful position." Id. at 256. Dr. Dozier noted that Plaintiff had a hernia on his left side from a kidney donation. Id. After observing Plaintiff in ambulation, Dr. Dozier wrote that Plaintiff "shows no signs of pain, ataxia, or shortness of breath. He walks with a normal steppage gait." Id. at 257. Plaintiff was able to sit without discomfort during the interview and to transfer on and off the examination table without assistance. Id. Dr. Dozier's functional assessment was that Plaintiff could stand, walk and sit for six hours in an eight hour day; lift or carry 25 pounds frequently and 50 pounds occasionally; but neither frequently bend, stoop, crouch, push or pull, nor climb ladders or work on incline planes. Id. at 259. The next month, on March 10, 2005, Dr. Lavanya Bobba conducted an assessment regarding Plaintiff and determined the Plaintiff's residual functional capacity remained the same. Id. at 262.

In April 2005, Dr. Larsen noted that Plaintiff walked with a limp and the assistance of a cane. AR at 196. He stated Plaintiff was "doing quite poorly" and was temporarily totally disabled. Id. at 197. Dr. Larsen stated Plaintiff would require fusion surgery to improve. Id. On July 18, 2005, the agreed medical examiner ("AME") Dr. John Strait, who first saw Plaintiff in 2004, found Plaintiff was temporarily totally disabled due to his back pain, and needed further treatment, including possibly surgery. Id. at 239-42.

Plaintiff had anterior interbody fusion and posterolateral fusion at L5-S1 surgery on April 3, 2006. AR at 279. Following surgery, Dr. Larsen noted "excellent lower extremity motor activity

and sensation" and that there were no complications. Id. at 347-48. Over the course of several months post-surgery, Dr. Larsen noted improvements to Plaintiff's condition, though still postulating that Plaintiff was temporarily totally disabled. Id. at 326 (September 5, 2006: Plaintiff "continues to improve"); Id. at 343 (June 12, 2006: "patient has improved postoperatively"). Plaintiff was given a bone stimulator to help with the fusion process in July. Id. at 340. In spite of the noted improvements, Plaintiff complained to Dr. Larsen about feelings of self-worthlessness and dysphoria in October 2006. Id. at 325. Dr. Larsen recommended that he see a psychiatrist. Id. at 326.

The AME again examined Plaintiff on March 8, 2007. AR at 279. Dr. Strait characterized the subjective complaints of Plaintiff "as being frequent and minimal to slight, increasing to moderate with heavier physical activity." Id. at 281. Considering Plaintiff's injury and complaints, the AME concluded Plaintiff was "limited to moderate work" and unable to return to his usual and customary occupation. Id. at 282. Dr. Larsen, however, disagreed with the AME's assessment, arguing his patient "should not lift greater than 20 pounds given his fusion," which would place him in a light work category rather than moderate. Id. at 302-03.

Plaintiff had an agreed medical psychological evaluation performed by Dr. Kathleen Murphy, meeting with her on April 5 and 10, 2007. AR at 395. Plaintiff reported to Dr. Murphy that he had some previous periods of depression, including when his father died and when he went through a divorce. Id. at 396-97. Plaintiff also said he had concentration and memory problems over the last two years, and panic attacks for about a year prior to the evaluation. Id. When discussing his pain levels, Plaintiff said the back pain was "4 out of 10, with 10 being the worst imaginable;" the pain in his side from the kidney donation was "2-3 out of 10" and "not that painful." Id. at 399. Plaintiff told the doctor that he would occasionally use marijuana for pain and assistance in sleeping. Id. Dr. Murphy stated "there was no evidence of any thought or perceptual disorder" and diagnosed Plaintiff with dysthymic disorder and depressive, avoidant personality features. Id. at 409-10. She stated his global assessment of functioning ("GAF") was 55, a "moderate" level, with the highest GAF of the year at 60. Id. at 397; see id. at 19. Though she did not assert any specific mental limitations, Dr. Murphy believed Plaintiff was temporarily totally disabled as of the date he reported depression to Dr. Larsen. Id. at 412.

On April 24, 2007, Dr. Larsen stated Plaintiff was "permanent and stationary per the Agreed Medical Evaluator's report" of the previous month, with back pain, right-sided neuralgia, and anxiety/ depression. AR at 298. Dr. Larsen completed a "Primary Treating Physician's Progress Report" on May 21, 2007, in which he stated Plaintiff had a lumbar fusion, low back pain, and anxiety. Id. at 296. Again, Dr. Larsen stated Plaintiff's work status was "per AME." Id. Therefore, seemingly, Dr. Larsen had come to believe that Plaintiff's condition no longer restricted him to only light work given that the AME's opinion, with which he then concurred, determined that Plaintiff could perform moderate work.

On July 10, 2008, Dr. Larsen completed a "Physical Capacities Evaluation" form and indicated Plaintiff could no longer lift nor carry weights. AR at 446. Dr. Larsen noted that his "patient is temporarily totally disabled and is precluded from all work activities at this time." Id.

ALJ Findings

The ALJ evaluated Plaintiff with the customary five-step evaluation. Pursuant to this sequential process, the ALJ established first that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset of disability on May 22, 2002 through his date-last-insured on December 31, 2007. AR at 15. Second, the ALJ found Plaintiff had several severe impairments: lumbar degenerative disc disease, status post-fusion, migraine headaches, obesity, and dysthymia. Id.

Next, the ALJ found no impairment, or combination of impairments, met or medically equaled one of the listed impairments: "although Mr. Thompson had impairments which were 'severe' by regulatory standards, they were not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements." AR at 15. Adding to this, the ALJ found Plaintiff's mental impairment failed to meet either provided criteria as Plaintiff had only moderate difficulties with concentration, persistence or pace with mild restrictions in activities of daily living and social functioning. Id.

At the fourth step, the ALJ determined Plaintiff had the residual functional capacity ("RFC") at his date-last-insured to lift and carry 20 pounds occasionally and 10 pounds frequently, to stand and walk for six hours, and to sit for six hours. AR at 16. Plaintiff could perform simple repetitive

8

tasks, subject to the following limitations: he could never climb ladders, ropes, or scaffolds.  Id. Occasionally, Plaintiff could balance, stoop, knee, crouch, crawl, and climb ramps or stairs.  Id. Based upon the RFC, medical evidence, and hearing testimony, the ALJ believed Plaintiff could not perform his past relevant work.  See id. at 16-17; Id. at 20.  However, the ALJ determined Plaintiff retained the ability to perform work that existed in significant numbers in the national economy through his date-last-insured, specifically citing the vocations of cleaner, sorter, and ironer.  Id. at 20-21.

Given the above findings under the five-step evaluation, the ALJ determined that Plaintiff was not disabled, as defined by the Social Security Act, through his date-last-insured.  AR at 21.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner of Social Security to deny benefits under the Act.  When reviewing findings of fact, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  See Sanchez v. Sec'y of Health & Human Serv., 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 289, 401 (1971), quoting Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938).  The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  Jones v. Heckler, 760 F.2d, 993, 995 (9th Cir. 1985).

## REVIEW

In order to qualify for benefits under Title II of the Social Security Act, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if,

his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

The burden of proof is on the claimant to establish his disability. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990). By showing he is unable to perform his past relevant work, the claimant establishes a prima facie case of disability. Maounis v. Heckler, 738 F.2d 1032, 1034 (9th Cir. 1984). Upon such showing, the burden shifts to the Secretary of Health and Human Services to prove the claimant is able to engage in other substantial gainful employment. Id.

To achieve uniform decisions, the Commissioner established regulations that include the five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520(a)-(f), 416,920(a)-(f) (1994). As noted, applying that process, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since May 22, 2002; (2) had medically determinable severe impairments (lumbar degenerative disc disease, status post-fusion, migraine headaches, obesity, and dysthymia); (3) did not have an impairment or combination of impairments that met or equaled one of the listed impairments set forth in 20 C.F.R.§ 404, Subpart P, Appendix 1; (4) was not able to perform his past relevant work; but (5) retained the ability to perform other work at the state and national level in significant numbers. AR at 15-20. Therefore, ALJ determined Plaintiff was not "disabled" as defined in the Act above through his date-last-insured. Id. at 21.

**DISCUSSION**

Plaintiff raises two primary claims on appeal. He contends (1) the ALJ's RFC lacks support of substantial evidence and (2) the ALJ failed to properly credit Plaintiff's subjective complaints. In particular, Plaintiff challenges the ALJ's determination of his RFC and his ability to do work in the state and national economy based upon this RFC. Plaintiff asserts the ALJ failed in his evaluation of the medical evidence and Plaintiff's subjective complaints in determining the RFC. Pl.'s Br. 3. Additionally, Plaintiff alleges the ALJ improperly discredited Plaintiff's testimony through failure to set forth legally sufficient reasons for rejecting his subjective complaints. Id. at 10.

10

1.   <u>The Administrative Law Judge supported the findings of Plaintiff's residual functional capacity with substantial evidence.</u>

In determining Plaintiff's RFC, the ALJ considered Plaintiff's symptoms, the extent to which his symptoms were consistent with objective medical evidence, and opinion evidence.  AR at 16. Plaintiff asserts that the ALJ failed to support the RFC with substantial evidence.  In support of this assertion, Plaintiff argues that the ALJ failed to conduct a thorough review of the medical evidence, that he did not meet his duty to develop the record, and that the ALJ did not recognize the distinction between the workers' compensation definition of disability and the definition of disability under the Act.

A.   <u>The ALJ thoroughly reviewed the medical evidence.</u>

The ALJ examined the medical records beginning with the care of Dr. Christiansen for the treatment of a lumbar strain.  AR at 17.  He recounted the objective findings of the doctors from 2002 (of an "L5-S1 central broadbased [sic] 4.5 mm posterior disc protrusion with mild effacement of the thecal sac but no evidence for spinal or foraminal stenosis") through 2007 (acknowledging the doctor's notation of a "loss of range of motion of the lubosacral spine" after the disc fusion surgery). <u>Id.</u> at 17-18.

Further, the ALJ considered the evaluation in which Dr. Murphy "diagnosed a dysthymic disorder, pain disorder with both medical and psychological factors, and depressive, avoidant personality features."  AR at 19.  She assessed Plaintiff as having "moderate" symptoms.  <u>Id.</u>  Dr. Murphy did not include a report regarding Plaintiff's functional limitations, and the ALJ could not determine how she arrived at the conclusion that he was temporarily totally disabled.  <u>Id.</u> Nevertheless, the ALJ acknowledged her findings, and as a result "limited Mr. Thompson to simple repetitive tasks based on an Agreed Medical Evaluation conducted in April 2007, by Kathleen Murphy, Ph.D."  <u>Id.</u>

In addition, the ALJ considered the work capacities recommended by the AME, who stated that Plaintiff was permanent and stationary, and limited to moderate work on March 8, 2007.  AR at 18.  Plaintiff's treating physician, Dr. Larsen, disagreed with this assessment at the time and opined that Plaintiff was limited to "light" work.  AR at 303.  Light work "involves lifting no more than 20

11

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567.  Later, Dr. Larsen reversed himself and reported that Plaintiff's "work status was as per AME," thereby indicating Plaintiff had improved beyond his ability to do "light" work.  AR at 18; see also AR at 298.  However, the ALJ applied the treating physician's earlier concerns to the RFC and determined that Plaintiff had the RFC to perform light work. Id. at 20.

The ALJ cited and discussed the medical evidence, including the opinions of Plaintiff's treating physician and consultative medical examiners over the course of the time from Plaintiff's injury through Plaintiff's date-last-insured, and even beyond the date-last-insured.  As such, the ALJ thoroughly reviewed the medical evidence, providing substantial evidence for his findings on the record.

### B.  The ALJ did not err in failing to seek further development of the record.

Plaintiff contends the ALJ erred in failing to develop the medical record.  However, the law imposes a duty on the ALJ to develop the record in only some circumstances.  20 C.F.R. §§ 404.1512(d)-(f), 416.912(d)-(f) (recognizing a duty on the agency to develop medical history, recontact medical sources, and arrange a consultative examination if the evidence received is inadequate for determination of disability).  For example, the ALJ has a heightened duty to develop the record in instances where the claimant is mentally ill because such claimants may not have the capacity to provide the ALJ with the necessary information.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  However, the duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); see 20 C.F.R. §§ 404.1512(e) and 416.912(e).

In DeLorme, the Court found a heightened duty to develop the record where the mental impairment of the claimant interfered with his ability to provide the requisite evidence of a disability. In DeLorme, the claimant suffered from severe depression for years and his psychological test scores and doctor observations indicated a "profound and suicidal depression." DeLorme, 924 F.2d at 843. In addition, the claimant was hospitalized because of depression, after which he participated in psychotherapy for approximately nine months.  Id. at 843-44.

In contrast with DeLorme, here, Plaintiff first mentioned feelings of "self-worthlessness and dysphoria" in October 2006 to Dr. Larsen. AR at 325-26. Likewise, only on one occasion did Plaintiff report past suicidal thoughts and then he clarified that he would never act upon the thoughts nor plan suicide. Id. at 409. Notably, Plaintiff had never been hospitalized or treated for mental illness.

Likewise, as previously stated, the ALJ determined that Plaintiff had only mild restrictions in activities of daily living and social functioning, with moderate difficulties with regard to concentration, persistence, or pace. AR at 16. In making these determinations, the ALJ considered comments made by Plaintiff to the consultative psychologist and the resulting evaluation produced by Dr. Murphy. Id. at 17-19. Notably, Dr. Murphy neither identified any mental limitation nor found "evidence of any thought or perceptual disorder," though she diagnosed Plaintiff with "a dysthymic disorder, pain disorder with both medical and psychological factors, and depressive, avoidant personality features." Id. at 19; see id. at 409. Moreover, Dr. Murphy determined that Plaintiff suffered only moderate symptoms, compared to the DeLorme claimant who had severe symptoms and "profound" depression. Therefore, the heightened duty to establish the record did not apply in this case.

Nevertheless, Plaintiff argues that "since the ALJ could not tell how Dr. Murphy arrived at the conclusion that he was [temporarily totally disabled], the ALJ should have recontacted her for clarification prior to setting forth his lay medical opinion" regarding Plaintiff's RFC. Pl.'s Reply Br. 4. However, though the ALJ was unable to determine how Dr. Murphy arrived at the conclusion that Plaintiff was temporarily totally disabled, he examined the reasons underlying her diagnoses of Plaintiffs conditions. The ALJ acknowledged the doctor's diagnoses of "a dysthymic disorder, pain disorder with both medical and psychological factors, and depressive, avoidant personality features." AR at 19. Further, he recounted Plaintiff's comments regarding depression, fear of the future, and worries about how he was going to support himself. Id. Also, the ALJ noted that the doctor found Plaintiff suffered from "moderate" symptoms. Id.

Finally, the evidence in the record cited by the ALJ was neither ambiguous nor inadequate to determine disability. As discussed, the record included information regarding the diagnoses and

their severity. The ALJ referenced the provided opinion of the doctor and the Plaintiff's comments to the doctor. See AR at 19. Ultimately, in his review of the mental evaluations, the ALJ found "no evidence of any thought or perceptual disorder." AR at 19. Then, the ALJ incorporated the conditions diagnosed by the doctor into the RFC, limiting the plaintiff to simple, repetitive tasks. See id. at 15,19. Thus, the ALJ did not err.

C.  The ALJ did not err by failing to be bound the Worker's Compensation definition of disability.

Plaintiff argues that his orthopedic impairment has not remained stable since the onset date, because sometimes the treating physician would find him permanent and stationary, and other times he would be listed as temporarily totally disabled. Pl.'s Br. 7-8. Plaintiff further argues that a finding of temporarily totally disabled by Dr. Murphy supports a finding of disability as defined under the Social Security Act, and that "the ALJ committed reversible error in failing to recognize this distinction between the workers' compensation definitions of disability and the definitions under Social Security." Id. at 8.

Workers' compensation definitions of disability are not conclusive in a Social Security matter. See Desrosiers v. Sec'y of Heath & Human Serv., 846 F.2d 573, 576 (9th Cir. 1982) (recognizing that the categories of work capabilities under workers' compensation and Social Security "are measured quite differently"). Further, the Court has regularly held that "the recommendations of treating physicians carry a special weight." Desrosiers, 846 F.2d at 577.[2] The ALJ did not find that the Plaintiff was temporarily totally disabled per the above-referenced findings of Dr. Murphy, the consultative medical examiner. Rather, the ALJ referenced Plaintiff's own treating physician, Dr. Larsen, who opined that his patient's work status was "per the AME" on May 21, 2007—after the date that Dr. Murphy believed Plaintiff to be temporarily totally disabled. AR at 18. As noted by the ALJ, the AME work status had Plaintiff listed as permanent and stationary, and limited to "moderate" work. Id. Thus, the ALJ was not bound by the terminology used–temporarily

---

[2] Notably, Plaintiff relies upon Derosiers for the proposition that the ALJ is bound by the determination, made in the context of a California Workers' Compensation case, that the applicant is temporarily totally disabled for purposes of Social Security benefits. Not only is this not the holding of Derosiers in this regard, it is inconsistent with the holding. Moreover, it is contrary to 42 U.S.C. § 423(d).

totally disabled–and was free to determine, based upon the evidence in the record from Plaintiff's treating physician, that he was capable of, at least light work. Therefore, there is no error.

### 2. The Administrative Law Judge Did Not Improperly Discount Plaintiff's Symptom Testimony.

Plaintiff argues that the ALJ improperly discounted Plaintiff's testimony concerning the severity of his symptoms through failing to set forth legally sufficient reasons for rejecting his subjective complaints. Pl.'s Br. 10.

An adverse finding of credibility must be based on clear and convincing evidence absent affirmative evidence of a claimant's malingering and "[w]here the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ may not discredit a claimant's testimony as to the severity of symptoms because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991). In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester v. Chater, 81 F.3d 821, 834; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Factors that may be considered include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).

Many of the above factors were considered by the ALJ as he determined that the Plaintiff's "statements about the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with my assessment of his residual functional capacity." AR at 19. The ALJ found that the claimant had inconsistencies in his testimony and comments made to his physicians, stating "although he alleges nerve damage secondary to kidney donation, he described it was *not that painful*" to the doctor. Id. Further, the ALJ noted that Plaintiff "engages in a level of

1 activity not fully consistent with his claim of disability.  For example, he is fully independent in self-
2 care activities."  Id.  Specific examples given by the ALJ included that the Plaintiff goes to the post
3 office and grocery store without assistance, drives his own car, and does housekeeping chores.  Id.
4 In Thomas, the claimant's ability to perform various household chores was considered as
5 inconsistent with the claimant's subjective complaints and as a basis for finding that she clacked
6 credibility with respect to her descriptions of pain.  Thomas, 278 F.3d at 959.  Similarly, the ALJ's
7 finding that Plaintiff's conducting household work was inconsistent with his descriptions of pain was
8 a valid finding in support of his RFC.

       In consideration of the medical evidence, the ALJ stated, "Objectively, there were no motor
or sensory deficits.  Nor were there any pathological reflexes."  AR at 19.  The ALJ specifically
alluded to the fact that Plaintiff was not seen as a candidate for additional surgery, nor seen in
emergency services through his date-last-insured.  Id.  Also, the ALJ noted that "further diminishing
his credibility, [Plaintiff ] also admitted occasional marijuana use," though this fact could either be
interpreted to credit or discredit Plaintiff's testimony.  Id.

       The ALJ observed that if Plaintiff "restricts himself to light exertion with associated
exertional and nonexertional limitations as discussed above then his overall symptomatology appears
to be controllable and within limits."  AR at 19.  In referencing the "above" limitations, the ALJ
referred to the previously mentioned recommendations of the consultative doctors and the state
agency, which determined Plaintiff was able to perform medium work provided he avoided uneven
terrain; occasionally stoop, knee, crouch, craw, and claim ramps; but never climb ladders, ropes or
scaffolds.  Id.  As the ALJ also mentioned, the "consultants later limited him to light work," and the
ALJ concurred with the physicians of record that Plaintiff was unable to return to his past relevant
work.  Id.

       Where the evidence supporting rejection of a claimant's credibility is substantial, and where
the ALJ did not arbitrarily reject the Plaintiff's testimony, the decision will be upheld even though
the finding is not extensive as possible and does not consider all possible factors.  Crane v. Shalala,
76 F.3d 251, 253 (9th Cir. 1996) (rejection upheld where the ALJ considered the claimant's daily
activities, notes of the treating therapist, and the claimant's response to treatment); Tidwell v. Apfel,

1  161 F.3d 599, 602 (9th Cir. 1999) (partial rejection of claimant's testimony upheld where the ALJ's
2  considered medical evidence, daily activities, and the claimant's testimony that medication aided
3  with her pain).
4  　　Similarly, here the ALJ considered inconsistent statements, Plaintiff's daily activities, and
5  medical records from physicians regarding Plaintiff's abilities.  Therefore, the Court concludes that
6  the ALJ provided clear and convincing reasons for rejecting Plaintiff's symptom testimony.

## CONCLUSION

8  　　For all these reasons, the Court concludes that the ALJ cited substantial evidence in the
9  record to support his conclusion that Plaintiff could perform work and was not disabled.  In addition,
10 he provided clear and convincing reasons for rejecting Plaintiff's symptom testimony.
11 　　Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the
12 Commissioner of Social Security.  The Clerk of Court IS DIRECTED to enter judgment in favor of
13 Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff Scotty
14 Thompson.

16 IT IS SO ORDERED.

17 Dated:   **September 7, 2010**　　　　　　　　　　　　　　　**/s/ Jennifer L. Thurston**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE